After resting a little time at Wall's gate, Walker started with the negro. It was early in February and the day very cold, and the sum about one and a half hours high in the evening. Wall was doubtful whether the negro was sick or deceitful; but did not hear Walker give any opinion, further than saying to the negro, "He had come on very well, until he had gotten to Mr. Wall's lane; that he had there fallen down, and if he did not go on better, he should be under the necessity of compelling him." At the distance of 600 yards or thereabouts from Wall's house Walker and the negro passed Webster and his son. Walker had two untrimmed switches in his hand. He was asked by Webster, "Whom he had there." He answered, "A runaway; a damned sullen fellow, who would not go along; and he would kill him, if he was his own, but he did not like to be hanged for killing a negro." The negro was walking slow and, Webster thought, appeared weak. Having passed Webster a little distance, Walker gave to the negro two stripes with a brushy switch which he had in his hand, and having gone to the distance of 100 yards or thereabouts, Webster looked back and saw the negro down in the road, (664) and Walker whipping him — he supposes with the switches which he had in his hand when he passed him. Webster thought Walker gave the negro an hundred stripes, but he could not speak with any certainty as to the number. The negro had on a great coat and those stripes were given whilst he lay on the ground.
The negro and Walker were then distant about 300 yards from Foy's shop. Foy heard a noise down the road, and he told Williams to go and see what was the matter. Williams went and found the negro standing in the road, and Walker a few yards from him. After some conversation with Walker about the negro, and Walker saying he was a sullen fellow and had fallen down and would not go along, the negro started and walked about 50 yards, when he fell down on his face. As soon as he fell, he turned his head, so as to take his face from the ground; and Walker, having an untrimmed gum-switch in his hand, came up and, applying both hands to the switch, struck him with it twice, violently, *Page 473 
across the face. The switch was nearly an inch in diameter at the butt end. Then taking one end of the stick tied across his back, he turned him over and dragged him by the end of the stick, about 6 feet. The negro then said, "Pray, sir, untie me." Williams advised Walker to untie him. Walker refused. Walker and Williams then assisted the negro to get up, and the negro walked a short distance and fell again on his face. Walker stepped up to him and kicked him on the hinder part of the neck with violence, and immediately kicked him on the side of the head with like violence, which last kick turned his face from the ground, so that the side of the head lay on the ground. Upon receiving the last kick the negro appeared to suffer a violent emotion in his countenance and in all his body. Walker then cut the string from one arm and partly cut it from the other. He requested Williams to untie the string, which Williams did with difficulty, as his fingers were benumbed with cold. Walker took the string, put it around the negro's neck, and gave it a jerk, which raised the head a little from the ground, and the negro's under jaw was observed to fall. Williams had a horse, (665) and Walker proposed to put the negro on the horse and take him to the shop; Williams, at first, objected; but they put up his breast on the saddle. Having gone about 20 yards, Walker walked round the horse and Williams asked him how the negro looked. Walker answered, "The scoundrel is holding his breath." They proceeded about 80 yards further and Walker went round the horse, and Williams again asked him how the negro looked. Walker answered, "The rascal is still holding his breath." They then determined to take him down, and Foy and his son having come up, assisted in taking him to the shop, where he was placed on a plank. Williams thinks the negro never breathed after the second kick aforesaid on the head. Whilst the negro was on the saddle, Williams observed that he thought he was dying. Walker answered that he was only deceitful.
Williams thought it was about twenty minutes from the time he came up until the negro was untied. That the negro was very weak, and that keeping him tied was unnecessary. He thought a child of 7 years old could have managed him.
Walker is a healthy man, aged about 60 years. The negro was a stout fellow aged about 21 years.
After placing the negro on a plank in the shop, Walker observed that he believed he was dead, and immediately went on to his owner, Mr. Guy. He told Guy that his negro was at Foy's shop, but did not mention to him that the negro was dead. Guy took irons to put on the negro, and on the way to the shop Guy observed that he feared the negro would be gone before he reached the shop. Walker then said he expected he would not, *Page 474 
and that he feared he was dead. He did not inform Guy of the circumstances of his ill-treatment to the negro. Walker remained in the neighborhood until he was arrested.
The negro died on Monday evening, and on Wednesday an inquest was holden. Several of the jurors of the inquest were of opinion that the negro's neck was dislocated, and that one of his eyes was destroyed. There was a dent in one of his temples, but whether the skull was (666) fractured or not was not known. One of the jurors thought that it was. There was a wound across the forehead, and some of the witnesses thought it was produced by the stroke of a hickory; others that it was occasioned by his fall on the ground. The upper lip was swelled, and some blood oozed from the gums. He was stripped and examined, but there was no appearance of any injury on any other part of his body.
His Honor, the judge, charged the jury that the prisoner was guilty of murder, or guilty of no offense at all; that he did not think it was a manslaughter case. The jury found the prisoner guilty of murder, and a new trial was moved for on behalf of the prisoner on the ground that it ought to have been left to the jury to say whether the prisoner was guilty of manslaughter or murder. This motion was disallowed, and an appeal was prayed for to the Supreme Court, which was granted, and the following reasons were filed for the said appeal by the counsel for the prisoner:
"That it ought to have been left to the jury to say whether the prisoner was guilty of manslaughter or murder; for —
"(1.) That in capital cases the jury are to judge of the law and of the facts. (2.) That the court is not to pronounce an opinion whether the prisoner is guilty of manslaughter or murder. (3.) That if the jury believed the prisoner thought the negro was deceitful only, and that was the cause of his falling down, the prisoner had cause of provocation, and if in this provocation he treated the negro with cruelty which occasioned his death, it ought to have been left to the jury to say whether death was the probable consequence of his cruelty. (4.) That the prisoner had the right to inflict upon the negro such correction as was necessary to make him proceed on the road home; that the law disregards the mode of correction, and looks only to degree of it; and it ought to have been left to the jury to say whether the correction given by the prisoner was such that death was or was not its probable consequence."
It is the province of the Court to pronounce whether the judge who tried the cause drew the correct legal *Page 475 
conclusion from the facts set forth in this record, which must have been made up from the evidence given in the cause, and stated to the jury in the summing up. To me it appears very clear that the statement of facts shows the prisoner to have been guilty of murder in point of law; and as the judge who tried the cause was of that opinion, he was bound to state it to the jury; that if he had left it to them, without instruction, to pronounce whether it was murder or manslaughter, he would have departed essentially from the purpose for which he presided over the trial, viz., to cause the law to be duly administered. The reason given for a new trial, viz., "that the court is not to pronounce an opinion whether the prisoner is guilty of murder or manslaughter," can only be correct upon the supposition that the court undertakes to pronounce upon the truth or falsehood of the facts given in evidence. But no such complaint is made in the case; and the supposition is wholly inadmissible. The charge of the judge appears to have corresponded with what Lord Vaughan calls the discreet and lawfulassistance of a judge to a jury, which is to give them an hypothetical direction: not by previously having their answer to the fact, and then declaring the law to control their verdict, but to leave their conduct free, by instructing them how the law is if they find the facts. This is also conformable to the opinion of the best writers on criminal law: "In every case where the point turneth upon the question whether the homicide was committed willfully and maliciously, or under circumstances justifying, excusing, or alleviating, the matter of fact is the proper and only province of the jury. But whether upon a supposition of the truth of facts such homicide be justified, excused, or alleviated, must be submitted to the court; for the construction the law putteth upon facts stated and agreed, or found by a jury, is in this, as in all other cases, undoubtedly the proper province of the court." Foster, 255.
I do not doubt the right of the jury, affirmed in the first reason, to judge of the law and of the facts; but they would often be much at a loss to exercise this right if they were not told by the court (668) how the law is; and, according to the sentiments of Mr. JusticeFoster, they will, "if they are well advised, always find a general verdict conformably to such directions." I take it for granted, as the contrary is not insisted on in the case, that the judge proceeded as is usual in other cases; that he stated to the jury what the witnesses had testified, and then told them that if they believed the witnesses, the offense established against the prisoner was murder in point of law, and not manslaughter, or any inferior species of homicide. In this I perfectly concur, and think justice has been done, as far as a court has any lawful agency in administering the law. *Page 476 
SEAWELL, J. We are all of opinion that the directions of the judge below were in accordance with the law arising from the evidence, and that in the manner of delivering them he neither transcended the act of Assembly nor invaded the province of the jury; that, in short, he confined his charge to the legitimate functions of a judge, explaining what was the law if the facts in evidence were true, leaving it to the jury to determine upon their truth or falsehood.
It has been insisted on for the prisoner that the court should have stated to the jury so much of the case from the evidence as would have made it manslaughter, and then informed them, if they disbelieved the other part of the evidence, that then the case would be manslaughter, and not murder. It is true, the judge might have done so, but in not doing it, surely there was nothing denied the prisoner; for such a charge would be giving to the State two chances for conviction, whereas, according to the course pursued, the jury were directed to acquit unless they believed all the testimony; and if it was true, no one will doubt the propriety of the verdict. Of this it was the peculiar province of the jury to judge. They did believe it, and have found accordingly; and had the case come up on their finding, we see no possible ground for being dissatisfied with their verdict.
(669) The rule for a new trial must, therefore, be discharged.
LOWRIE, J., DANIEL, J., and RUFFIN, J., concurred in this opinion.
[The prisoner was pardoned by Governor Miller.]
Cited: S. v. Hildreth, 31 N.C. 434; S. v. Matthews, 78 N.C. 532; S.v. Vines, 93 N.C. 498.